## IRVING TRUST CO. v. BREVOORT SECURITY CORPORATION.

### In re MANN'S ESTATE.

### In re PEERLESS MFG. & SUPPLY CO.
### No. 6569.

District Court, E. D. New York.
June 30, 1933.

Krause, Hirsch & Levin, of New York City (George C. Levin, of New York City, of counsel), for plaintiff.

Lewis, Marks & Kanter, of Brooklyn, N. Y. (Lloyd B. Kanter, of Brooklyn, N. Y., of counsel), for defendant.

904

MOSCOWITZ, District Judge.

This is an action in equity by a trustee in bankruptcy to recover an alleged fraudulent transfer under section 67e of the National Bankruptcy Act, title 11 USCA § 107 (e).

The facts briefly are as follows: The Peerless Manufacturing & Supply Company, a copartnership (hereinafter referred to as the bankrupts) was engaged in the wholesale selling of plumbing supplies at No. 35 Bond street, in the borough of Manhattan, city of New York.

The defendant, Brevoort Security Corporation, a New York corporation, was and is engaged in the finance business at No. 1266 Bedford avenue, in the borough of Brooklyn, city of New York.

On November 24, 1931, the bankrupts (prior to the filing of an involuntary bankruptcy petition) entered into an agreement with the defendant by virtue of which the bankrupts, in consideration of the sum of $5,000, purported to sell to the defendant certain accounts receivable enumerated in the said agreement and marked Schedule A, totaling the sum of $8,734.60, and as security for the payment of the claims set forth in Schedule A assigned certain claims enumerated in the aforesaid agreement and marked Schedule B, totaling the sum of $9,625.42.

Thereafter, and within four days of this alleged sale, the bankrupts on November 28, 1931, executed a voluntary assignment for the benefit of creditors, and subsequently on December 14, 1931, an involuntary petition in bankruptcy was duly filed against the bankrupts in the United States District Court for the Southern District of New York, and the bankrupts were in due course adjudicated as such.

According to the testimony of William Seligman, the president of the defendant corporation, the entire transaction from its inception to its conclusion was consummated within the space of thirty hours, although neither Seligman nor the defendant company had ever had any business dealings with the bankrupts prior thereto, the deal being entered into merely because Seligman's brother knew the bankrupts' general reputation and thought they were decent people.

It is significant that no real inquiry was made as to the bankrupts' financial condition. Seligman testified that he had not inquired as to the amount of accounts receivable which remained after the alleged assignment; that he did not ask for, nor did he receive, a financial statement; that no inquiry was made as to the amount of inventory; that he did not inquire as to the amount of the bankrupts' liabilities; that he did not ask for a financial report, nor did he cause the books of the bankrupts to be examined by an accountant. He testified that there was some talk as to the bankrupts' solvency, but all he could remember was "trying to arrive at the fact as to whether they were solvent and they told me they were, and I was fairly well satisfied at that time." It appears that the bankrupts' total liabilities were $93,874.47 and its total assets were $30,200.

Seligman admits knowing that the bankrupts had pressing obligations and that they were unable to get cash and needed money to pay bills, that the bankrupts had formerly dealt with another finance company on an unsatisfactory basis, and that the bankrupts had advised him that they were in difficulties with their bank, and that the bank would not allow them to draw against uncollected funds, causing them "discomfort." Seligman further admitted that the defendant had never engaged in a similar transaction, was not equipped to do this type of business, and that it did not buy accounts, inasmuch as it was "strictly in the automobile finance business but this was a special transaction."

It further appears that the $5,000 check given by the defendant for this alleged purchase did not go into the bankrupts' bank account, but that the check in question was cashed at the defendant's bank. The check bears the bankrupts' indorsement, and this indorsement was guaranteed by Charles Seligman, the brother of the president of the defendant corporation. The explanation has been offered that the bank refused to cash the check at the request of the bankrupts, who thereafter procured the guaranty as to its signature by Charles Seligman in order that the bankrupts might be able to receive the cash. The record is barren, however, of any testimony as to what ultimate disposition was made of the $5,000.

Of the total accounts assigned in the sum of $18,360.02, the defendant effected net collections in the sum of $8,412.67. Deducting the $5,000 given by the defendant to the bankrupts leaves the sum of $3,412.67, which is the amount in suit.

Section 67e of the National Bankruptcy Act, title 11 USCA § 107 (e), provides as follows: "All conveyances, transfers, assignments, or incumbrances of his property or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this title within four months prior to the fil-

ing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned, or encumbered as aforesaid shall, if he be adjudged a bankrupt, and the same is not exempt from execution and liability for debts by the law of his domicile, be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors."

The testimony in this case leads to the conclusion that the transfer herein was with the intent and purpose to delay and defraud the creditors, and that the purchaser was not a purchaser in good faith for a present fair consideration. For $5,000 the defendant received more than $18,000 in accounts, it made no inquiries whatsoever, inquiries which a reasonable and prudent business man would have made if the transaction had been bona fide. The defendant knew the bankrupts were unable to pay their bills; it knew that the bankrupts had previous unsatisfactory deals with another finance company; it knew that the $5,000 check was not deposited in the bankrupts' bank account; it made no inquiries whatsoever, procured no financial statement, did not cause the books of the bankrupts to be examined, made no inquiries as to the amount of liabilities, and consummated the entire transaction within thirty hours after its inception. When there is added to these facts the cashing of the check in the manner disclosed and the filing of a voluntary assignment for the benefit of creditors within four days thereafter, the presumption of fraud arising therefrom becomes a conclusive presumption of fact. Every element of the transaction entered into by the defendant herein negatives any suggestion of good faith on its part, and the consideration was not a fair one.

That the defendant was not a purchaser in good faith for a present fair consideration has been fully demonstrated, and its conduct was "a fraudulent turning away from a knowledge of facts which the res gestæ would suggest to a prudent mind." In re Davis (D. C.) 8 F.(2d) 65.

The complainant may have a decree as prayed for.

Settle findings and decree on notice.